**968**

UNITED STATES of America, the State of New York, Plaintiffs-Appellees,

v.

HOOKER CHEMICALS & PLASTICS CORP., Hooker Chemical Corp., Occidental Petroleum Investment Co., Occidental Petroleum Corp. & City of Niagara Falls, N.Y. ("S"-Area Landfill), Defendants,

Hooker Chemicals & Plastics Corp., City of Niagara Falls, New York, Defendants-Appellees,

Niagara Environmental Action, Ecumenical Task Force of the Niagara Frontier, Inc., Pollution Probe Foundation, and Operation Clean Niagara, by its President, Margherita Howe, Appellants.

Nos. 104, 186, Dockets 84-6110, 84-6112.

United States Court of Appeals, Second Circuit.

Argued Sept. 24, 1984.
Decided Nov. 15, 1984.

Beryl Kuder, Asst. Atty. Gen., New York City, Robert Abrams, Atty. Gen. N.Y., and Eileen Ordover, Law Student Intern, New York City, for plaintiff-appellee, the State of N.Y.

Joel E. Schweitzer, Niagara Falls, N.Y., Gellman, Brydges, Schrof & Schweitzer, Niagara Falls, N.Y., for defendant-appellee, City of Niagara Falls, N.Y.

Howard R. Berman, Cambridge, Mass., Barbara Morrison, Buffalo, N.Y., for appellants, Ecumenical Task Force of the Niagara Frontier, Inc., Pollution Probe Foundation, and Operation Clean Niagara.

Robert J. Sugarman, Philadelphia, Pa., Sugarman, Denworth & Hellegers, Philadelphia, Pa., Lewis Steele and John E. Galeziowski, Buffalo, N.Y., for appellant Niagara Environmental Action.

George Berger, New York City, Louis Nizer, Martin H. Wasser, Phillips, Nizer, Benjamin, Krim & Ballon, New York City, Thomas H. Truitt, William R. Weissman, Donna Brown Grossman, Wald, Harkrader & Ross, Washington, D.C., David K. Floyd, Phillips, Lytle, Hitchcock, Blaine & Huber, Buffalo, N.Y., for defendants, Hooker Chemicals & Plastics Corp., Hooker Chemical Corp., Occidental Petroleum Inv. Co. and Occidental Petroleum Corp.

Lloyd S. Guerci, Asst. Chief of the Environmental Enforcement Section, Land and Natural Resources Div., Washington, D.C., F. Henry Habicht, II, Asst. Atty. Gen., Washington, D.C., Salvatore R. Martoche, U.S. Atty., Buffalo, N.Y., Dirk D. Snel and Wendy B. Jacobs, Dept. of Justice, Washington, D.C., for plaintiff-appellee, U.S.

Before FRIENDLY, MESKILL and PIERCE, Circuit Judges.

FRIENDLY, Circuit Judge.

The appellants are four environmental organizations. Two, the Ecumenical Task Force ("ETF") and Niagara Environmental Action ("NEA") are New York organizations; many members of ETF and all members of NEA are directly affected by industrial pollution of the Niagara River. The two others, Pollution Probe Foundation ("PPF") and Operation Clean Niagara ("OCN") are Canadian organizations; many members of PPF and all members of OCN live in the Niagara region of the Province of Ontario and are directly affected by pollution of the Niagara River both by itself and as it flows into Lake Ontario. The appeals are from an order of Chief Judge Curtin of the District Court for the Western District of New York denying the appellants' applications to intervene under F.R.Civ.P. 24(a). 101 F.R.D. 451. ETF, PPF and OCN appealed only insofar as the order denied intervention as of right under F.R.Civ.P. 24(a); NEA appealed from the denial both of intervention as of right under Rule 24(a) and of permissive intervention under Rule 24(b), but has not briefed the latter point, which we regard as waived.

This action was begun on December 20, 1979, when the United States filed a complaint against Hooker Chemicals & Plastics Corporation, its parent, Hooker Chemical Corporation, Hooker Chemical Corporation's parent, Occidental Petroleum Investment Corporation, and the latter's parent, Occidental Petroleum Corporation (collectively, "Hooker"); and the City of Niagara Falls, New York (the "City"). The State of New York (the "State") was soon joined as a defendant upon a motion by Hooker pursuant to F.R.Civ.P. 19(a); having requested and received permission to be realigned as a plaintiff, the State filed its own complaint against Hooker and the City. The City and Hooker also filed cross-claims against one another.

The action concerns Hooker's use of an approximately four-acre landfill on the American bank of the Niagara River (the "S-area") to dispose of more than 70,000 tons of hazardous chemical wastes between 1947 and 1975. The complaint of the United States, as amended on June 18, 1980, alleged that migration from the S-Area of a number of dangerous chemicals, many of them carcinogenic, was contaminating the Niagara River and, in some cases, the public drinking water supplied by the Niagara Falls Drinking Water Treatment Plant (the

"Plant"), which is located approximately 200 yards east of the S-area dump site. According to the allegations made in the complaint, the porous nature of the soil in the S-Area landfill permits toxic wastes dumped by Hooker to mix with shallow subsurface water and then "leach out" eastwards toward the Niagara River. The complaint alleged further that, given the nature of the soil in the vicinity of the S-area and the Plant, and the load-bearing capacity and age of the Plant's pipes, there is a high probability that some of the Plant's subsurface pipes would crack or leak within the next 50 years, with the additional consequent danger that Hooker's chemical wastes might directly enter the water supply in high enough concentration to cause "a human health disaster." The complaint alleged that Hooker's conduct created "an imminent and substantial endangerment to the health of persons" under § 1431 of the Safe Drinking Water Act ("SDWA"), 42 U.S.C. § 300i;[1] "an imminent and substantial danger to health or the environment" under § 7003 of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6973;[2] and "an imminent and substantial endangerment to the health of persons or to the welfare of

1. Section 1431 of the Safe Drinking Water Act provides in full:

Notwithstanding any other provision of this subchapter the Administrator, upon receipt of information that a contaminant which is present or is likely to enter a public water system may present an imminent and substantial endangerment to the health of persons, and that appropriate State and local authorities have not acted to protect the health of such persons, may take such actions as he may deem necessary in order to protect the health of such persons. To the extent he determines it to be practicable in light of such imminent endangerment, he shall consult with the State and local authorities in order to confirm the correctness of the information on which action proposed to be taken under this subsection is based and to ascertain the action which such authorities are or will be taking. The action which the Administrator may take may include (but shall not be limited to) (1) issuing such orders as may be necessary to protect the health of persons who are or may be users of such systems (including travelers), and (2) commencing a civil action for appro-

priate relief, including a restraining order or permanent or temporary injunction.
42 U.S.C. § 300i(a).

2. Section 7003 of the Resource Conservation and Recovery Act provided at the time this suit was brought:

Notwithstanding any other provision of this chapter, upon receipt of evidence that the handling, storage, treatment, transportation or disposal of any solid waste or hazardous waste is presenting an imminent and substantial endangerment to health or the environment, the Administrator may bring suit on behalf of the United States in the appropriate district court to immediately restrain any person for contributing to the alleged disposal to stop such handling, storage, treatment, transportation, or disposal or to take such other action as may be necessary. The Administrator shall provide notice to the affected State of any such suit.
42 U.S.C. at § 6973. Section 7003 was amended in 1980, Pub.L. No. 96–482, § 25, Oct. 21, 1980, 94 Stat. 2348.

persons" under § 504 of the Clean Water Act ("CWA"), 33 U.S.C. § 1364.[3] It also alleged that Hooker's "unreasonable interference" with the interest of the United States in protecting the health of its citizens, including those traveling in interstate commerce, constituted a public nuisance.[4] Finally, the complaint alleged that Hooker had deposited wastes in navigable waters of the United States without obtaining a permit from the Secretary of the Army in violation of § 13 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 407. We summarize the rather complex and specific relief sought in the complaint:

1. A mandatory injunction requiring Hooker, *inter alia,*

(a) to install and maintain a perpetual monitoring program for all subsurface water at the S-area;

(b) to install grout curtain vaults down to and penetrating the bedrock encircling both the S-area and the Plant;

(c) within the grout curtain vaults, to cover the entire area with a suitable clay cap, graded with top soil and seeded;

(d) to install a leachate collection system and destroy any leachate subsequently collected by it;

(e) to vent the area within the grout curtain in a specified manner, and filter gas that is vented;

(f) to isolate all pipes and structures of the Plant, seal off the current water intake system, construct an alternative intake system that will be free of leachate migrating from the S-area, and pay for the installation and operation of an optimized pilot granular activated carbon treatment system at the Plant; (or, as an alternative to these measures, construct a new drinking water treatment plant); also, to pay for continuous monitoring of the public drinking water supply until the remedial measures are completed;

(g) to clean the water distribution system used to provide water to the public, and replace all systems for which cleanup cannot be accomplished to the levels required by the EPA and the State of New York;

(h) to perform in perpetuity any additional remedial measures which the EPA determines to be necessary on the basis of the monitoring reports.

2. An order to the City of Niagara Falls to cooperate fully with the implementation of all the remedial measures required by the mandatory injunction.

3. An order requiring Hooker either to deposit $50,000,000 in an annuity trust account to assure accomplishment of these measures or to obtain a bond insuring the availability of the necessary funds.

---

**3.** Section 504 of the Clean Water Act provides: Notwithstanding any other provision of this chapter, the Administrator upon receipt of evidence that a pollution source or combination of sources is presenting an imminent and substantial endangerment to the health of persons or to the welfare of persons where such endangerment is to livelihood of such persons, such as inability to market shellfish, may bring suit on behalf of the United States in the appropriate district court to immediately restrain any person causing or contributing to the alleged pollution to stop the discharge of pollutants causing or contributing to such pollution or to take such other action as may be necessary.
33 U.S.C. § 1364(a).

**4.** The amended complaint did not make clear whether this public nuisance claim was asserted on the basis of federal common law or as a pendent state law claim. In light of *Milwaukee*

*v. Illinois,* 451 U.S. 304, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981), and *Middlesex County Sewerage Authority v. National Sea Clammers Ass'n,* 453 U.S. 1, 21–22, 101 S.Ct. 2615, 2627, 69 L.Ed.2d 435 (1981), decided after the amended complaint was filed, any common law claim to abate a water pollution hazard would have to be based on state common law. On December 10, 1982, the United States moved for leave to file a second amended complaint abandoning the common law nuisance claim and adding claims under §§ 104, 106 and 107 of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §§ 9604, 9606, 9607, which was enacted subsequent to the Government's first amended complaint. The district court has not yet acted on this motion for leave to file this second amended complaint, presumably because of the probability of settlement.

4. An order requiring Hooker to reimburse the United States for all funds expended for remedial actions related to the discharge of wastes in the S-area landfill.

5. Retention of jurisdiction by the court until all remedial measures had been effectuated.

6. An award of costs and any other relief the court should find just and appropriate.

*See* Joint App. at 35–38.

The complaint of the State of New York alleged "on behalf of itself and as *parens patriae* on behalf of all residents and citizens of the State of New York" seven causes of action for public nuisance and three causes of action for violations of N.Y. Environmental Conservation Law §§ 17–0501, –0701, –0803. For relief the State sought a judgment directing Hooker to:

> abate the nuisance at the S-area landfill ... by taking such actions as the court shall find to be necessary and sufficient to completely and permanently abate the migration and threat of migration of these chemical wastes, including all actions necessary and sufficient to protect permanently the safety of the water furnished by the City of Niagara Falls Water Treatment Plant.

The State also sought compensatory and punitive damages, as well as civil penalties for the alleged violations of the Environmental Conservation Law. *See* Joint App. at 58–59.

Finally, the City filed cross-claims for relief, essentially borrowing allegations made by the United States and the State. Seven claims were alleged against Hooker for creating a "continuing public and private nuisance." In addition, the City alleged an eighth claim for statutory violations of §§ 17–0501, –0701, and –0803 of the N.Y. Environmental Conservation Law. The relief sought by the City included both the general and the specific. Like the State, the City sought a general mandatory injunction compelling Hooker to take "such remedial action as this Court shall find to be necessary, sufficient and feasible to completely and permanently abate the nuisance ...." Answer to Amended Complaint of United States and Cross-Claim of City of Niagara Falls, Prayer for Relief. In addition, like the United States, the City sought implementation of certain specific measures, including, *inter alia,* cleaning or closing of the intake system of the Plant, together with continued monitoring of it; installation of leachate collection systems; and cleaning and monitoring of the water distribution system. Finally, the City sought "damages for all injuries caused by the discharge of ... Hooker's chemical wastes," specifying no precise figure, and reimbursement and indemnification for all funds expended by the City in connection with Hooker's use of the S-area landfill. *Id.*

This action was one of four similar ones filed by the United States in December, 1979 against Hooker for allegedly polluting activities in the Niagara Falls area. All four cases were referred to Chief Judge Curtin. In early 1980, the United States and Hooker agreed to discuss settlement of the four cases. The first suit in which an agreement was reached involved what is called the Hyde Park Landfill. After discovery and pre-trial procedures, the parties to the Hyde Park litigation filed a settlement agreement with the court in January 1981; this was approved on April 30, 1982, after publication of the settlement, a period for notice and comment, hearings and extensive argument by the parties and numerous intervenors and *amici.*[5] *See United States v. Hooker Chemicals & Plastics Corp. (Hyde Park Landfill),* 540 F.Supp.

---

5. The final two cases concern the Love Canal and another landfill, the 102nd Street Landfill. The Government is currently conducting remedial work at Love Canal pursuant to the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 *et seq.,* and a cost recovery action against Hooker is pending. In the case concerning the 102nd Street Landfill, federal and state representatives have begun meetings with Hooker and the Olin Corporation concerning a possible settlement.

1067, 1071–72 (W.D.N.Y.1982). ETF, OCN and PPF participated in the case as *amici.*

In October 1980, following the conclusion of settlement meetings regarding the Hyde Park Landfill, Hooker commenced settlement negotiations with representatives of the United States, the State and the City concerning the S-area landfill; these proceeded continuously from that date for three years, involved over 100 meetings and were well-known to environmental groups.

On July 16, 1982, NEA moved to intervene as a plaintiff in this action. NEA claimed it was entitled to intervene as of right under both F.R.Civ.P. 24(a)(1) and (2) [6] and also sought permissive intervention under F.R.Civ.P. 24(b).[7] The interest sought to be vindicated by intervention under Rule 24(a)(2) was the dangerous exposure to toxic wastes of NEA's members as drinkers of the water treated by the Plant. With respect to the possible impairment of that interest from the Government's suit, the motion claimed that "[f]or all practical extents and purposes, this litigation will determine the final nature of any necessary remedial program at the 'S'-area dump site and surrounding areas including the City of Niagara Falls Drinking Water Treatment Plant," particularly if the litigation were concluded by a settlement. The motion also claimed that the litigation would have at least a *stare decisis* effect on subsequent litigation that NEA or its members might initiate or be involved in and might affect the ability of NEA or its members successfully to assert tort claims against Hooker, the United States, the State, and the City for actions those parties might be required to take as a result of a court-approved settlement or a litigated final judgment. The motion alleged further that the present parties did not and would not adequately represent applicant's health and safety interests. This allegation was supported by an affidavit of a co-counsel that relied particularly on assertions of a lack of assiduity by the United States, State and City in monitoring the water entering the Plant and in effecting closure of an allegedly contaminated intake line. In addition, the affidavit alleged that the plaintiffs "refused to deal seriously" with the question of relocating the Plant. With respect to timeliness, the motion asserted that it was not until March, 1982 that NEA became aware that the existing parties were not adequately protecting its interests. Joint App. at 62–68. NEA attached an elaborate, 57 page "Class Action Complaint of Intervention," alleging sixteen claims for relief. The first three claims were premised on the government's initiation of the suit and asserted a right to intervene and raise claims to enforce the emergency powers provisions of the SDWA, the RCRA and the CWA under the citizen suits provisions of the same three acts, *see* 42 U.S.C. § 300j-8 (SDWA); *id.* § 6972 (RCRA); 33 U.S.C. § 1365 (CWA). There followed a claim for abatement of a public nuisance, and then twelve tort claims premised upon various theories of negligence, negligence *per se*, strict liability, trespass, products liability, battery, assault, infliction of emotional distress and injury, and intentional conduct. NEA also demanded a jury trial. In addition to seeking relief very similar to that already demanded by the United States, the State, and the City, the complaint asked for a study by a disinterested third party to compare the long and short term costs and benefits of constructing a

---

6. Rule 24(a) provides:
    (a) Intervention of Right. Upon timely application anyone shall be permitted to intervene in an action: (1) when a statute of the United States confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

7. The first sentence of Rule 24(b) provides:
    Upon timely application anyone may be permitted to intervene in an action: (1) when a statute of the United States confers a conditional right to intervene; or (2) when an applicant's claim or defense and the main action have a question of law or fact in common.

new drinking water plant at an uncontaminated location versus continuing to operate the existing plant after taking all proper measures to enhance its safety; the prayer asked for an order directing Hooker to implement the alternative found to provide the greatest long term measure of security. NEA also sought an order requiring Hooker to fund a medical detection program and to establish an "equitable fund" equivalent to the present value of all future damages attributable to Hooker's S-area operations, initially to be set at $100 million and to be supplemented as necessary. Finally, NEA sought punitive damages of $1 billion (after payment of all costs and fees) to be distributed to plaintiff and the class it represents. Joint App. at 203–07. Opposing papers were filed by the United States insofar as NEA sought intervention as of right, the City and Hooker; the State approved the intervention.

In an order dated July 30, 1982, Judge Curtin set a briefing schedule and scheduled oral argument to consider whether NEA was entitled to intervene, and, if so, "the status to be accorded to the intervenors and ... the parameters of their intervention." Joint App. at 141. After the argument, the judge raised certain questions concerning the membership and actual functioning of NEA, and requested further information on these subjects. This was furnished in November, 1982 and the judge was later to express satisfaction with it; however, NEA's motion remained undecided.

On March 21, 1983, ETF, PPF and OCN filed a joint motion to intervene as plaintiffs pursuant to F.R.Civ.P. 24(a)(2) and (b). ETF's interest, like NEA's, derived from its members' exposure to allegedly contaminated water supplied by the Plant. PPF's interest related to the discovery of contaminants, allegedly emanating from the S-area landfill, downstream in the water column of Lake Ontario where they were alleged to pose an imminent danger, even in low concentrations, to the health and safety of PPF's members, who drink water and consume fish taken from Lake Ontario. OCN's interest consisted of the threat to those of its members who maintain bedrock wells in Niagara Falls, Ontario, from the possible movement of tar-like concentrated toxic chemicals from the bedrock under the Niagara River to the Canadian regional bedrock acquifer. Impairment of that interest was alleged to result from a possible *stare decisis* effect and from the possibility that improper remediation could "exacerbate existing migration by opening new and additional pathways for chemical movement from the landfill." The lack of adequate representation by existing plaintiffs was allegedly demonstrated by their allowing ETF members and others to continue to consume water processed through the Plant, their lack of emphasis on data accumulation that would properly identify all possible pathways for contaminant movement from S-area landfill to the Niagara River, and their failure to pay sufficient attention to the need "to fully define the plume of non-aqueous contaminant movement in bedrock beneath the Niagara River to Canada." Joint App. at 211–15. The motion was supported by five lengthy affidavits from counsel for intervenors, a biochemist, a chemist and two engineers. The complaint attached to the motion set forth nine common law claims of public nuisance, assault and battery over which the court was alleged to have ancillary jurisdiction. The complaint sought injunctive relief, demanded that Hooker undertake an elaborate "sampling and analytical program" (1) to determine the geologic, hydrogeologic, chemical and geochemical characteristics in the vicinity of the S-area landfill and the Plant; (2) to determine the nature and extent of chemical migration in the vicinity of the S-area landfill and the Plant; and (3) to ascertain the relative effectiveness of available remedial alternatives. Using this study, Hooker was then to prepare and implement a remedial program "which contains or removes the 'S'-area landfill contaminants, cleans up chemicals which have already migrated from the site, and remediates or relocates the City of Niagara Falls Drinking Water Treatment Plant." All phases of the study and program were to

"be submitted to and be subject to approval by plaintiffs and intervenors at each appropriate stage of their development." Joint App. at 405–38. Opposing papers were again filed by the United States insofar as the motion sought intervention as of right, and by Hooker as to intervention on any basis; the City opposed intervention but expressed willingness not to oppose permissive intervention so long as this was subject to scrutiny by the court to insure that it would not "unduly delay or prejudice . . . the original parties to this litigation." The State of New York again supported the intervention. .

On June 13, 1983, the Province of Ontario and its Minister of the Environment (the "Province") moved for leave to intervene as a party plaintiff under F.R.Civ.P. 24(a)(2) or, in the alternative, under F.R. Civ.P. 24(b). The memorandum and affidavits in support of this motion revealed that the interests of these applicants were similar to those asserted by PPF and OCN. Like these groups, the Province alleged a threat to the health of persons drinking water or consuming fish caught from Lake Ontario and the Niagara River. The Province asserted additional interests relating to transboundary waters as reflected in the Boundary Waters Treaty and the 1978 Great Lakes Agreement. Pointing to the predominant concern of the existing plaintiffs with the water supplied to American citizens by the Plant, the Province maintained that Canadian citizens were inadequately represented. Memorandum in Support of Motion to Intervene. In its proposed complaint, the Province alleged four claims, one for violations of effluent limitations and permit requirements under the CWA, see 33 U.S.C. §§ 1311, 1342, 1365; two for violations of the emergency powers provisions of the CWA and the RCRA; and one based on the state common law of nuisance. For relief the Province, like the State and the City, requested "an injunction requiring defendants to take all such measures as may be necessary to prevent any further migration of hazardous chemical wastes from the S-area and water treatment sites through any medium, including

bedrock." The prayer went on to suggest some possible measures, including physical containment, drainage, excavation and continued monitoring. Joint App. at 541–46.

Argument on the application of ETF, PPF and OCN and the application of the Province was heard on October 12, 1983. On February 10, 1984, the court granted the application of the Province under Rule 24(a)(2). 101 F.R.D. 444. On the issue of inadequate representation, "the most seriously disputed point," the court stated that "[t]here is, of course, a Canadian side of the Niagara River, and the water from the Niagara River flows into Lake Ontario," and found:

> it is not possible to be certain that the present parties will attach equal significance to what Ontario views as its paramount interests—the prevention of the migration of chemicals into Lake Ontario and into the regional aquifer on the Canadian side of the Niagara River.

Joint App. at 574, 578, 580.

Meanwhile, the settlement negotiations begun in 1980 had continued. Prior to the order granting Ontario's intervention, the United States, the State, the City and Hooker had entered into a proposed settlement agreement which was lodged with the court on January 10, 1984. The centerpiece of this 208-page agreement is an elaborate containment program. Hooker is required first to conduct surveys and studies to determine the nature and extent of the migration of toxic chemicals from the S-area toward the Niagara River and into the bedrock beneath the River; particular attention is given to possible migratory pathways to the Plant. These surveys and studies are to be used to determine the appropriate technology required to abate the hazard. Hooker is required to install a barrier wall, a drain tile collection system, barrier plugs and a cap at the S-area landfill. In addition, drain tile collection systems are to be installed in and around the Plant, and Hooker is required to construct a new intake system to protect the integrity of the public drinking water supply. Hooker and the City share maintenance

responsibilities for these systems. Hooker is also obliged to guarantee $20 million over a 35-year period to cover the costs of these remedial programs; but this sum is not to exceed $10 million after construction of the containment system. The judgment includes a precautionary "Environmental Health and Safety Plan" in connection with the installation and operation of these systems, and assesses $2.5 million against Hooker, to be paid over eight years, in full discharge of all civil penalties and other claims of the United States, the State and the City in connection with the S-area dump site.

As required by 28 C.F.R. § 50.7, a 30-day period was afforded in which persons not named as parties might comment on the proposed judgment. Under § 50.7, the Department of Justice is required to consider comments received and to file them with the court; the Department has the right to withdraw or withhold its consent to the judgment if the comments indicate that the judgment is inappropriate, improper or inadequate. Notice initiating the public comment period was published on January 19, 1984, 49 F.R. 2324. At the request of appellants, the Department of Justice twice extended the public comment period, for 30 days and 14 days respectively. Appellants filed no comments; the only comment received was from the Canadian government in opposition to the settlement, and after due consideration, the Department of Justice concluded that this provided no basis for modifying or withdrawing it. In its opinion granting the Province's motion to intervene, the court announced that, in conformity with the procedure it had followed in the *Hyde Park Landfill* case, *supra,* 540 F.Supp. 1067, it would conduct public hearings at which witnesses would be called, examined and cross-examined by the parties in order to develop a complete and accurate record on the basis of which the court would determine whether to approve the settlement.

On March 12, 1984, the court denied the intervention motions of NEA, ETF, PPF and OCN. It rejected NEA's position that it had a statutory right to intervention un-

der F.R.Civ.P. 24(a)(1) on the basis that the citizen suits provisions of the statutes relied upon conferred no rights in suits brought under the emergency powers provisions. With respect to intervention of right under Rule 24(a)(2), it held that NEA and ETF had failed to show that their interests were inadequately represented by the United States or the State of New York, and that PPF and OCN had failed to show inadequate representation of their interests by the Province of Ontario. The court also denied permissive intervention; as explained above, the propriety of this ruling is not before us. The court emphasized, however, that it "by no means suggests that intervenors are unwelcome in environmental lawsuits," and, citing *Friends of the Earth v. Carey,* 535 F.2d 165, 172 (2d Cir.1976), acknowledged that citizen participation in such suits is to be welcomed and encouraged. Joint App. at 607. It therefore "strongly encourage[d] each of the applicants to participate as *amici curiae* in the hearings [to] be held in connection with the court's review of the proposed settlement and judgment." *Id.* It characterized the participation of ETF, PPF and OCN as *amici* in the *Hyde Park Landfill* hearings as having been "very beneficial," and said that it "invites and expects the same sort of participation from Niagara Environmental Action and again from the other groups in the present case." *Id.* In an order dated March 22, 1984, scheduling hearings from April 30 through May 4, 1984, resuming, if necessary, on May 10, 1984 until the conclusion of all testimony, the judge specified that the *amici* could call witnesses. His approving references, in the order denying these groups' motions to intervene, to the procedure used in the hearings conducted in the *Hyde Park Landfill* case also make clear that they would have been allowed to cross-examine, *see* 540 F.Supp. at 1072. Unhappily, this invitation was not accepted, and appellants took no part in the hearings, which were held between April 30 and May 3, 1984. Consequently, only the Province opposed the settlement. The question of

approval of the settlement is still pending in the district court, possibly because of the pendency of this appeal.

## DISCUSSION

I. *Statutory Intervention Under Rule 24(a)(1)*

Of the four appellants, only NEA, with support from the State of New York, asserts a right to intervene under F.R.Civ.P. 24(a)(1), which provides for such intervention "when a statute of the United States confers an unconditional right to intervene." [8] NEA claims to find statutory authorization in the citizen suits provisions of the CWA, 33 U.S.C. § 1365; the SDWA, 42 U.S.C. § 300j-8; and the RCRA, 42 U.S.C. § 6972.

The structure of the citizen suits provisions is the same in all three of these acts.[9]

8. One reason for NEA's seeking a statutory basis to intervene is that this would enable it to obtain fees for experts and attorneys. *See* Reply Affidavit of Lewis Steele ¶ 14, Joint App. at 170; 33 U.S.C. § 1365(d) (CWA); 42 U.S.C. § 300j-8(d) (SDWA); *id.* § 6972(e) (RCRA).

9. The Clean Water Act provides, in pertinent part:

§ 1365. Citizen Suits
(a) Authorization; jurisdiction
Except as provided in subsection (b) of this section, any citizen may commence a civil action on his own behalf—
(1) against any person (including (i) the United States and (ii) any other governmental instrumentality or agency to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation, or
(2) against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator.
. . . .
(b) Notice
No action may be commenced—
(1) under subsection (a)(1) of this section—
(A) prior to sixty days after the plaintiff has given notice of the alleged violation (i) to the Administrator, (ii) to the State in which the alleged violation occurs, and (iii) to any alleged violator of the standard, limitation, or order, or
(B) if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States or a State to require compliance with the standard, limitation or order, but in any such action in a court of the United States any citizen may intervene as a matter of right.
. . . .
The similar provision in the Safe Drinking Water Act provides, in pertinent part:
§ 300j-8. Citizen's civil action
(a) Persons subject to civil action; jurisdiction of enforcement proceedings
Except as provided in subsection (b) of this section, any person may commence a civil action on his own behalf—
(1) against any person (including (A) the United States, and (B) any other governmental instrumentality or agency to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of any requirement prescribed by or under this subchapter, or
(2) against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this subchapter which is not discretionary with the Administrator.
. . . .
(b) Conditions for commencement of civil action; notice
No civil action may be commenced—
(1) under subsection (a)(1) of this section respecting violation of a requirement prescribed by or under this subchapter—
(A) prior to sixty days after the plaintiff has given notice of such violation (i) to the Administrator, (ii) to any alleged violator of such requirement and (iii) to the State in which the violation occurs, or
(B) if the Administrator, the Attorney General, or the State has commenced and is diligently prosecuting a civil action in a court of the United States to require compliance with such requirement, but in any such action in a court of the United States any person may intervene as a matter of right;
. . . .
Finally, the citizen suits provision of the Resource Conservation and Recovery Act provides, in pertinent part:
§ 6972. Citizen suits.
(a) In general
Except as provided in subsection (b) or (c) of this section, any person may commence a civil action on his own behalf—
(1) against any person (including (a) the United States, and (b) any other governmental instrumentality or agency to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of any permit, standard, regulation, condition, requirement, or order which has become effective pursuant to this chapter; or

There is first the establishment of a private right of action in certain types of cases, then a prohibition against private suits if the responsible governmental official has commenced and is diligently prosecuting a suit for the same purpose, and, finally, permission to intervene as of right when government initiation has foreclosed the individual's opportunity to bring the action. Intervention is limited to government initiated actions that could have been brought by the individual but for the government action. The three statutes differ, however, in the language used to describe the cases a private individual can initiate. Under the CWA, a private citizen may commence a civil action, or intervene if the government has already commenced such an action, when anyone "is alleged to be in violation of (A) an effluent standard or limitation under [the Act] or (B) an order issued by the Administrator or a State with respect to such a standard or limitation . . . ." 33 U.S.C. § 1365(a). The SDWA provides this right for alleged violations of "any requirement prescribed by or under this [Act]." 42 U.S.C. § 300j–8(a). Finally, the RCRA allows initiation or intervention by private persons in cases alleging violations of "any permit, standard, regulation, condition, requirement, or order which has become effective pursuant to this [Act]." *Id.* § 6972(a).

■ As we have already noted, the United States brought this suit pursuant to the "emergency powers" provisions of these same three acts. *See* 33 U.S.C. § 1364(a) (CWA); 42 U.S.C. § 300i (SDWA); *id.* § 6973 (RCRA). All of these provide, with differences not pertinent here,[10] that

"[n]otwithstanding any other provision" of the act, the Administrator may bring suit on behalf of the United States in order to abate a pollution risk that presents "an imminent and substantial endangerment" to the health of persons. NEA's argument that it has a statutory right to intervene is predicated on the assumption that allegations that a polluter's activities create "an imminent and substantial endangerment" constitute grounds for an individual to bring an action and thus also to intervene in a government action under the citizen suits provisions of these acts. The district judge held that a suit brought under the emergency powers provisions is not one that a citizen could have commenced, and thus is not one in which he is given a statutory right to intervene, Joint App. at 594–97. This was a conclusion that he had previously reached, *see Hyde Park Landfill, supra,* 540 F.Supp. at 1080 n. 7 (RCRA), and that has found support elsewhere, *see, e.g., Committee for Consideration of Jones Falls Sewage Sys. v. Train,* 375 F.Supp. 1148, 1153 n. 8 (D.Md.1974) (CWA), *aff'd,* 539 F.2d 1006 (4th Cir.1976) (en banc); *see also* Skaff, *The Emergency Powers in the Environmental Protection Statutes: A Suggestion for a Unified Emergency Provision,* 3 Harv.Envtl.L. Rev. 298, 301 n. 22 (1979); *cf. Stream Pollution Control Bd. v. United States Steel Corp.,* 512 F.2d 1036, 1041–42 (7th Cir.1975) (Stevens, J.) (suit based on federal common law of nuisance does not allege violations of a "standard, limitation or order" within the meaning of the citizen suits provision of the CWA). *But see Jones v. Inmont Corp.,* 584 F.Supp. 1425, 1433–35

---

(2) against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this subchapter which is not discretionary with the Administrator.

. . . .

(b) Actions prohibited

No action may be commenced under paragraph (a)(1) of that section—

(1) prior to sixty days after the plaintiff has given notice of the violation (A) to the Administrator; (B) to the State in which the alleged violation occurs; and (C) to any alleged vio-

lator of such permit, standard, regulation, condition, requirement or order; or

(2) if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States or a State to require compliance with such permit, standard, regulation, condition, requirement, or order: *Provided, however,* That in any such action in a court of the United States, any person may intervene as a matter of right.

. . . .

**10.** These statutes are set out *supra* notes 1–3.

(S.D.Ohio 1984) (citizen suits provision of the RCRA authorizes suits to enforce the emergency powers provision). Our analysis of the language, structure and legislative histories of these acts leads us to agree with Chief Judge Curtin that neither the CWA nor the SDWA nor the RCRA affords NEA a statutory right to intervene in a government initiated action under the emergency powers provisions of those acts.

The language of the CWA makes disposition of NEA's claim under this act the easiest of the three. Citizen suits are permitted to enforce "an effluent standard or limitation" or "an order issued by the Administrator or a State with respect to such a standard or limitation." 33 U.S.C. § 1365(a). The creation of "an imminent and substantial endangerment" is neither. *Cf. Stream Pollution Control Bd., supra,* 512 F.2d at 1041–42 (action to abate a nuisance is not one to require compliance with an effluent standard or limitation or an order so that no statutory right to intervene exists). Effluent standards and limitations are administratively established regulations of particular types of dischargers on the amounts of pollutants that may be discharged. *See* 33 U.S.C. § 1362(11) (defining an "effluent limitation" as "any restriction established by a State or the Administrator on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources ...."); Zener, *The Federal Law of Water Pollution Control,* in Federal Environmental Law 682, 684 (Envtl.L.Inst.1974). The Environmental Protection Agency ("EPA") is required to establish effluent standards and limitations that all point source dischargers are required to meet. *E.g.,* 33 U.S.C. §§ 1311, 1312, 1316, 1317. The EPA is also given authority, with certain procedural limitations, to issue orders and to bring civil suits to enforce these effluent standards and limitations. *Id.* § 1319. The language of the citizen suits provision clearly refers

only to this aspect of the CWA's regulatory and enforcement scheme, and not to the provision empowering the Administrator to bring suit to prevent "an imminent and substantial endangerment" from a pollution source, which is directed toward a different problem.

The legislative history confirms this reading of the CWA. The discussion of the citizen suits provision in the Senate Report explains that "[a]uthority granted to citizens to bring enforcement actions under this section is limited to effluent standards or limitations *established administratively* under the Act." S.Rep. No. 414, 92d Cong., 2d Sess. 80 (1972), *reprinted in* 1972 U.S.Code Cong. & Ad.News 3668, 3747 (emphasis added). The Report then lists those sections of the CWA referred to; the emergency powers provision is not among them. *See id.* The portion of the Senate Report discussing section 309 of the Act, 33 U.S.C. § 1319, which provides the Administrator with authority to enforce effluent standards, specifically recognized that "the public is provided the right to seek vigorous enforcement action under the citizen suits provisions" should state and federal agencies fail to exercise their enforcement responsibility. *Id.* at 63, 1972 U.S.Code Cong. & Ad.News at 3730. No mention is made of citizen suits, however, in the discussion of the emergency powers provision, which the Report describes as a grant of "new authority" to the Administrator for "immediate effective action" in case of an emergency "water pollution episode." *Id.* at 77, 1972 U.S.Code Cong. & Ad.News at 3744. In this connection, it is worth noting that the notice requirement for commencing a citizen suit, *see* 33 U.S.C. § 1365(b)(1)(A) (60 days notice to Administrator, State and alleged polluter), although not inconsistent with the enforcement of effluent standards established by an already slow administrative process, does not fit easily with the notion of "immediate effective action." [11]

---

11. Moreover, Congress waived this notice requirement in actions for violations of 33 U.S.C. §§ 1316 (new source effluent limitations) and 1317 (toxic pollutant effluent limitations). *See id.* § 1365(b). Surely Congress also would have waived the 60 day notice requirement for emer-

According to the Senate Report, the section of the Act authorizing citizen participation was "carefully restricted to actions where violations of standards and regulations ... are alleged," S.Rep. No. 414, *supra* at 78, 1972 U.S.Code Cong. & Ad.News at 3745, in order to limit private suits to supplemental enforcement of administratively established criteria, and to prevent individuals from invoking the power of the courts to set as well as enforce standards:

> [The citizen suits provision] would not substitute a "common law" or court-developed definition of water quality An alleged violation of an effluent control limitation or standard, would not require reanalysis of technological in [sic] other considerations at the enforcement stage. These matters will have been settled in the administrative procedure leading to the establishment of such effluent control provision. Therefore, an objective evidentiary standard will have to be met by any citizen who brings an action under this section.
>
> . . . .
>
> ... [T]he participation of citizens in the courts seeking enforcement of water pollution control requirements should not result in inconsistent policy. Whether abatement is sought by an agency or by a citizen, there should be a considerable record available to the courts in any enforcement proceeding resulting from the Federal and State administrative standard-setting procedures. Consequently, the factual basis for enforcement of requirements would be available at the time enforcement is sought, and the issue before the courts would be a factual one of whether there has been compliance.

*Id.* at 78, 79, 1972 U.S.Code Cong. & Ad. News at 3745, 3746. This description is clearly inapplicable to suits brought under the emergency powers provision, which often involve technical evaluations relating to pollutants for which no effluent levels have

been established, *see United States v. Waste Indus., Inc.*, 734 F.2d 159, 164 (4th Cir.1984); Douglas, *Safe Drinking Water Act of 1974—History and Critique*, 5 Envtl.Aff. 501, 536 (1976), and which are judged under an open-ended, "court-developed" standard of what constitutes "an imminent and substantial endangerment." *See* S.Rep. No. 172, 96th Cong., 2d Sess. 5 (1980), *reprinted in* 1980 U.S.Code Cong. & Ad.News 5019, 5023 (1980 amendments to RCRA) ("Like other imminent and substantial endangerment provisions in environmental statutes (*e.g.*, section 504 of the Clean Water Act ... and section 1431 of the Safe Drinking Water Act), section 7003 [of the RCRA] is essentially a codification of common law nuisance remedies."); Skaff, *supra*, 3 Harv.Envtl.L.Rev. at 312–18.

NEA concedes that "a literal interpretation of the CWA's Citizen Suits section would not permit unconditional intervention," Brief for NEA at 15, but maintains that intervention should nonetheless be allowed under the CWA in such circumstances as those in this case. Citing only an unreported decision of the District Court for the Northern District of Alabama, *United States v. Olin Corp.*, No. CV80-PT-5300-NE (N.D.Ala. June 25, 1982), NEA argues that a statutory right to intervene should be found if the government complaint states facts that *could have been* relied upon to bring suit under other provisions of the act for which this right is expressly provided. But the plaintiff is master of his own complaint. *See The Fair v. Kohler Die & Specialty Co.*, 228 U.S. 22, 25, 33 S.Ct. 410, 411, 57 L.Ed. 716 (1913). So long as suit was properly brought under the emergency powers provision, a fact uncontested here, it is irrelevant that suit perhaps could also have been brought under some other provision. The simple truth of the matter is that this suit was *not* brought under any provision of the CWA except the emergency powers provision, and, as we have demonstrated,

gencies requiring immediate action had it intended to include such suits within the scope of the citizen suits provision.

the citizen suits provision of the act confers no rights respecting that provision.

Section 1449 of the SDWA authorizes a citizen suit or citizen intervention in a government suit that alleges violations of "any requirement" prescribed under the Act, 42 U.S.C. § 300j–8(a), (b); section 7003 of the RCRA provides for similar citizen participation in suits alleging violations of "any permit, standard, regulation, condition, requirement, or order" which becomes effective pursuant to the act, *id.* § 6972(a), (b). Relying on its argument that the "imminent and substantial endangerment" language of the emergency powers provisions of these two acts erects a "substantive" legal standard in addition to conferring "jurisdictional" authority to bring suit, NEA maintains that the emergency powers provisions create a "requirement" within the meaning of the citizen suits provision of the SDWA, and a "standard," "condition" or "requirement" within the meaning of the citizen suits provision of the RCRA that one not cause "an imminent and substantial endangerment" to health. Consequently, NEA concludes, a government suit under the emergency powers provisions of these statutes carries with it an unconditional right for private persons to intervene. Brief for NEA at 12–14.

To begin, we fail to see how resort to the protean distinction between "substantive" and "jurisdictional" matters aids NEA. The citizen suits provisions do not provide a right to bring an action or to intervene in a government action alleging violations of "any substantive standard" established in the legislation. The fact that the emergency powers provision may establish a "substantive" standard is thus irrelevant. The proper inquiry is whether emergency actions are included among the particular types of actions for which citizen participa-

tion is authorized by the citizen suits provisions of the SDWA and RCRA. This inquiry is neither answered nor even particularly aided by the argument that the emergency powers provisions are substantive in nature.[12]

NEA's argument for statutory intervention under these statutes is nevertheless stronger than its argument for intervention under the CWA. In contrast with the CWA, it is at least possible, without distorting language beyond its ordinary meaning, to argue that these emergency powers provisions establish a "requirement" or "condition" or "standard," and are thus within the scope of the respective citizen suits provisions. Also, the legislative histories of these provisions contain much less than their counterparts in the CWA to indicate the relation, if any, between the emergency powers and citizen suits provisions. *See, e.g.,* H.R.Rep. No. 1185, 93d Cong., 2d Sess. (1974), *reprinted in* 1974 U.S.Code Cong. & Ad.News 6454 (SDWA); H.R.Rep. No. 1491, 94th Cong., 2d Sess. (1976), *reprinted in* 1976 U.S.Code Cong. & Ad.News 6238 (RCRA). What little guidance there is in the legislative materials concerns the RCRA, and supports reading that act in the same manner as we have read the CWA. In its discussion of the citizen suits provision, the Senate Report, borrowing language drawn directly from the legislative history of the CWA, states that citizen participation is "carefully restricted to actions where violations of standards and regulations ... [are] alleged." S.Rep. No. 988, 94th Cong., 2d Sess. 18 (1976).

Despite the differences between the CWA and the SDWA and RCRA, we conclude that the citizen suits provisions of the SDWA and the RCRA also do not grant a right to private parties to intervene in government suits brought under the emer-

---

**12.** Thus we disagree with the district court in *Jones v. Inmont, supra,* 584 F.Supp. 1425, cited both NEA and the State of New York, which held that the citizen suits provision of the RCRA authorized a private action to enforce the emergency powers provision of that statute because the emergency powers provision "contains substantive provisions or requirements." *Id.* at

1435. Our own reading of this Act convinces us that, whether or not the Ohio district court is correct concerning the substantive nature of the emergency powers provision, that provision does not relate to a "permit, standard, regulation, condition, requirement or order" within the meaning of the citizen suits provision.

gency powers provisions. The similarity between the structure of the two latter acts and the CWA is too striking to overlook. All three acts center around elaborate regulatory schemes that use administrative proceedings to establish pollution control standards. *See, e.g.,* 33 U.S.C. §§ 1311–1317 (CWA); 42 U.S.C. §§ 300g–1, 300h (SDWA); *id.* §§ 6922–6927 (RCRA); *cf.* Douglas, *supra,* 5 Envtl.Aff. at 521 (regulations represent the "backbone" of the Act); Zener, *supra,* Federal Environmental Law at 683–94. All three acts contain, in addition, specific enforcement provisions—equally elaborate in detail—authorizing the Administrator to issue orders and bring civil suits to insure compliance with the regulations, guidelines, standards, or permits issued under these acts. *See* 33 U.S.C. § 1319 (CWA); 42 U.S.C. §§ 300g–2, –3, 300h–1, –2 (SDWA); *id.* § 6928 (RCRA). Finally, all three acts contain provisions for citizen suits and for suits by the Administrator in emergency situations. This similarity in the structure of these acts is no mere coincidence: in the two later acts, Congress replicated an evidently successful enforcement scheme for pollution control legislation. *See* S.Rep. No. 988, *supra,* at 16, 18 (citizen suits provision and emergency powers provision of RCRA drew on "substantially identical" provisions from Clean Water Act); *cf.* W. Rogers, Environmental Law 208–14 (1977). As we have shown above, the language, structure and legislative history of the CWA amply demonstrate that the citizen suits provision of that act does not confer any rights respecting the emergency powers provision. The similarity between the CWA and the later

enacted SDWA and RCRA leads us to read all three acts in a similar manner. The differences in language noted by NEA among the citizen suits provisions of the three acts are more than adequately explained by differences in the core regulatory schemes to which the language pertains, and do not support the conclusion that Congress revised the basic enforcement scheme or the role of the "private attorney general" in that scheme.

## II. Denial of Intervention as of Right under Rule 24(a)(2)

The propriety of the denial of the applications to intervene under F.R.Civ.P. 24(a)(2) is a closer question. Rule 24(a)(2) seeks to identify those circumstances in which the interests favoring intervention so far outweigh those opposed that intervention should be granted as of right. As originally adopted in 1938, the Rule required that the prospective intervenor either have an interest in "property in the custody of the court" or face the consequence of being "bound" by a judgment. *See* F.R.Civ.P. 24(a), Advisory Committee Note to 1966 Amendments [hereinafter cited as 1966 Advisory Committee Note]. The Rule proved too restricted in many cases to accomplish the goal of accommodating the conflicting interests of parties and intervenors. *See* 1966 Advisory Committee Note; Kaplan, *Continuing Work of the Civil Committee: 1966 Amendments of the Federal Rules of Civil Procedure (I),* 81 Harv.L.Rev. 356, 400–01 (1967); Shreve, *Questioning Intervention of Right—Toward a New Methodology of Decisionmaking,* 74 Nw.U.L.Rev. 894, 918 (1980).[13]

---

**13.** The lower courts responded to the felt inadequacy of F.R.Civ.P. 24(a)(2) by interpreting the language beyond its plain meaning. *See* 1966 Advisory Committee Note ("some decided cases virtually disregarded the language of the provision"); Shreve, *supra,* 74 Nw.U.L.Rev. at 904; *e.g., Formulabs, Inc. v. Hartley Pen Co.,* 275 F.2d 52, 56 (9th Cir.1960) (in personam jurisdiction over party with knowledge of secret formula makes formula subject to control of court) (cited by 1966 Advisory Committee Note); *International Mortgage & Inv. Corp. v. Von Clemm,* 301 F.2d 857, 862 (2d Cir.1962) ("It is enough under Rule 24(a)(2) that an adverse judgment will

seriously prejudice those who seek to intervene ...."); *Atlantic Refining Co. v. Standard Oil Co.,* 304 F.2d 387, 394 (D.C.Cir.1962) (it is sufficient for intervention as of right that effect of judgment is as severe as if intervenor would be bound formally). However, in *Sam Fox Publishing Co. v. United States,* 366 U.S. 683, 81 S.Ct. 1309, 6 L.Ed.2d 604 (1961), the Supreme Court took a restrictive approach to the Rule, holding that the "bound" language meant formally bound by *res judicata.* This holding created a Catch-22 situation with respect to intervention by a class member in a pending class action on grounds of inadequate representation: if the

The 1966 amendments to Rule 24(a) simplified the Rule to provide for intervention of right upon a timely application establishing that the intervenor has an interest in the subject matter of the litigation that may as a practical matter be impaired by the outcome of the litigation and that is not adequately represented by existing parties. F.R.Civ.P. 24(a)(2); *Restor-A-Dent Dental Laboratories, Inc. v. Certified Alloy Products, Inc.*, 725 F.2d 871, 874 (2d Cir.1984). The 1966 amendments focused on abandoning formalistic restrictions in favor of "practical considerations" to allow courts to reach pragmatic solutions to intervention problems. *See* 1966 Advisory Committee Note; *United States v. City of Jackson*, 519 F.2d 1147, 1150–51 (5th Cir.1975); C. Wright, Federal Courts 502 (1983). As amended, Rule 24(a)(2) is a nontechnical directive to courts that provides the flexibility necessary "to cover the multitude of possible intervention situations," *Restor-A-Dent Dental Laboratories, supra,* 725 F.2d at 875, and that requires consideration of all of the competing and relevant interests raised by an application for intervention, *see City of Jackson, supra,* 519 F.2d at 1150–51. *See also* 3B Moore & Kennedy, Moore's Federal Practice ¶ 24.07[1] at 24–52 (2d ed. 1984) [hereinafter cited as Moore's Federal Practice]; Shapiro, *Some Thoughts on Intervention Before Courts, Agencies and Arbitrators*, 81 Harv.L.Rev. 721, 740 (1968). Professors Wright and Miller call it "an obvious and important truth" that in applying Rule 24(a)(2) courts should "not make a fortress of the dictionary" but rather should "apply the rule with thoughtful consideration of the objectives it is intended to serve." 7A Wright & Miller, Federal Practice and Procedure § 1904 at 474 (1972). *See also* Shreve, *supra,* 74 Nw.U.L.Rev. at 909–10, 920; Kaplan, *supra,* 81 Harv.L.Rev. at 405; *cf Restor-A-Dent, supra,* 725 F.2d at 874–75;

*Atlantis Dev. Corp. v. United States*, 379 F.2d 818, 829 (5th Cir.1967).

This means several things: The various components of the Rule are not bright lines, but ranges—not all "interests" are of equal rank, not all impairments are of the same degree, representation by existing parties may be more or less adequate, and there is no litmus paper test for timeliness. Application of the Rule requires that its components be read not discretely, but together. A showing that a very strong interest exists may warrant intervention upon a lesser showing of impairment or inadequacy of representation. Similarly, where representation is clearly inadequate, a lesser interest may suffice as a basis for granting intervention. *Cf.* 3B Moore's Federal Practice, *supra,* ¶ 24.07[1] at 24–51 ("the requirements of interest, impairment and inadequacy of representation are but three facets of the same problem"). The requirements for intervention embodied in Rule 24(a)(2) must be read also in the context of the particular statutory scheme that is the basis for the litigation and with an eye to the posture of the litigation at the time the motion is decided. Finally, although the Rule does not say so in terms, common sense demands that consideration also be given to matters that shape a particular action or particular type of action. One such matter is identified in a valuable Note, *Intervention in Government Actions*, 89 Harv.L.Rev. 1174 (1976) [hereinafter cited as Harvard Note]:

> It is clear that the language of the rule does not readily accommodate an examination of statutory enforcement schemes. The rule was designed with the more traditional private action in mind, and its adaptation to other contexts requires a flexible reading of its provisions.

*Id.* at 1177 (footnote omitted); *see also Nuesse v. Camp*, 385 F.2d 694, 700 (D.C.

class member was in fact inadequately represented, the judgment would not bind him, *see Hansberry v. Lee,* 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940); on the other hand, if representation was adequate, there was no ground for his intervention. The 1966 amendments to Rule

24(a) endorsed the flexible reading given Rule 24 by the courts of appeals over the restrictive approach taken by the Supreme Court. *See* 1966 Advisory Committee Notes; Shreve, *supra,* 74 Nw.U.L.Rev. at 905 & n. 49.

Cir.1967) (rule was tailored for private actions and must be read differently in other contexts) (quoting *Textile Workers Union v. Allendale Co.*, 226 F.2d 765, 767 (D.C. Cir.1955) (en banc)).

In the present case, the district judge denied intervention on the basis of his finding that appellants failed to demonstrate "that their interests may be inadequately represented by the existing parties." Order No. 10 at 9, Joint App. at 597. This conclusion, in turn, was based to a large extent on the fact that the existing parties were governmental entities. *See id.* at 9–11, Joint App. at 597–99. We agree with the district court that it is significant to the analysis required by Rule 24(a)(2) that the plaintiffs are governmental entities suing on behalf of their citizens. In such actions, the state or the United States presents itself "in the attitude of *parens patriae*, trustee, guardian or representative of all her citizens." *Louisiana v. Texas*, 176 U.S. 1, 19, 20 S.Ct. 251, 257, 44 L.Ed. 347 (1900). Once quite limited, the concept of *parens patriae* has been expanded to include actions in which a state seeks to redress quasi-sovereign interests, such as damage to its general economy or environment, even where the injury is to a fairly narrow class of persons. *See Hawaii v. Standard Oil Co.*, 405 U.S. 251, 257–59, 92 S.Ct. 885, 888–89, 31 L.Ed.2d 184 (1972); *Puerto Rico ex rel. Quiros v. Bramkamp*, 654 F.2d 212, 215–16 (2d Cir.1981), *cert. denied*, 458 U.S. 1121, 102 S.Ct. 3509, 73 L.Ed.2d 1383 (1982); Note, *State Protection of its Economy and Environment:*

*Parens Patriae Suits for Damages*, 6 Colum.J.L. & Soc.Probs. 411, 412 (1970).

Courts of appeals in other circuits have concluded that a government asserting its status as *parens patriae* deserves special consideration when the issue is adequacy of representation. We are cited by appellees to *Environmental Defense Fund v. Higginson*, 631 F.2d 738 (D.C.Cir.1979) (per curiam), an action by EDF and two other environmental groups to compel certain federal officials to prepare an environmental impact statement relating to projects and operations in the Colorado River basin. The district court granted the applications of four states, including Colorado and Nevada, for leave to intervene. The applications of four Colorado and one Nevada water district, however, were denied on the ground that the local entities were adequately represented by the states in their capacity as *parens patriae*. The Court of Appeals for the District of Columbia affirmed.[14] Conceding, perhaps too readily, that the statement in *New Jersey v. New York*, 345 U.S. 369, 373, 73 S.Ct. 689, 691, 97 L.Ed. 1081 (1953) (per curiam), that an intervenor whose state is already a party must demonstrate "some compelling interest in his own right, apart from his interest in a class with all other citizens and creatures of the state, which interest is not properly represented by the state," is limited to original actions in the Supreme Court, 631 F.2d at 739–40, the court went on to hold:

> Under the *parens patriae* concept, however, a state that is a party to a suit

---

**14.** This decision is especially notable in that it comes from the Court of Appeals for the District of Columbia Circuit which has been quite liberal in other contexts in finding representation by existing parties to be inadequate so as to allow intervention under Rule 24(a)(2). *See, e.g., Nuesse v. Camp*, 385 F.2d 694, 702–04 (D.C.Cir. 1967) (intervention by bank commissioner of Wisconsin as additional party defendant allowed in action by Wisconsin bank to enjoin Comptroller from granting permission to another bank to open a branch because "serious possibility" that representation "may be inadequate" exists); *NRDC v. Costle*, 561 F.2d 904 (D.C.Cir.1977) ("minimal burden" to show inadequate representation required of affected in-

dustry members seeking intervention in action to compel EPA to establish regulations). Judge Leventhal, who had authored the *Nuesse* opinion, was a member of the majority of the divided panel in *Higginson*, which also cited *NRDC v. Costle* in a footnote for the proposition that in private suits the burden of showing inadequate representation is minimal, *see Higginson*, 631 F.2d at 740 n. 6. *See also SEC v. Dresser Indus., Inc.*, 628 F.2d 1368, 1390 (D.C.Cir.) (corporate officer should have been allowed to intervene in SEC action against corporation, but with hindsight it is clear his interests were adequately represented), *cert. denied*, 449 U.S. 993, 101 S.Ct. 529, 66 L.Ed.2d 289 (1980).

involving a matter of sovereign interest is presumed to represent the interests of all its citizens. Thus, to intervene in a suit in district court in which a state is already a party, a citizen or subdivision of that state must overcome this presumption of adequate representation. A minimal showing that the representation may be inadequate is not sufficient. The applicant for intervention must demonstrate that its interest is in fact different from that of the state and that that interest will not be represented by the state.

*Id.* at 740 (footnote omitted). A similar presumption of adequate representation has also been applied in suits where intervention is sought on the side of a governmental party by courts of appeals in the Third and Fifth Circuits. *See Pennsylvania v. Rizzo,* 530 F.2d 501, 505 (3d Cir.), *cert. denied sub nom. Fire Officers Union v. Pennsylvania,* 426 U.S. 921, 96 S.Ct. 2628, 49 L.Ed.2d 375 (1976); *Delaware Valley Citizens' Council for Clean Air v. Pennsylvania,* 674 F.2d 970, 973–74 (3d Cir.1982); *New Orleans Public Service, Inc. v. United Gas Pipe Line Co.,* 690 F.2d 1203, 1213 & n. 7 (5th Cir.1982) (citing *Higginson.* for the proposition that "where governmental parties are already present in case, private parties must make more than a minimal showing of inadequate representation," and requiring consumers to show that the governmental party is "ill-equipped or unwilling" to protect their interests before finding inadequate representation). *See also Wade v. Goldschmidt,* 673 F.2d 182, 186 n. 7 (7th Cir.1982) (citing *Higginson* for proposition that there is a presumption of adequate representation "when the proposed intervenor and a party to the suit (especially if it is a state) have the same ultimate objective.").

Appellants seek to distinguish these cases on the basis that the applicants for intervention were political subdivisions of the state. Although the *Higginson* opinion does begin by stating: "[i]n this case we consider the circumstances under which a sub-state entity may intervene in an action in federal district court in which the parent state is already a party," 631 F.2d at 739 (footnote omitted), the portion of the opinion already quoted refers to "a citizen or subdivision of [the] state," *id.* at 740, and it is clear that the court is merely applying a presumption ordinarily applied to private citizens to political subdivisions as well. Moreover, this assertion simply is not true of the intervenors in the cases decided in the other two circuits. *See Rizzo, supra,* 530 F.2d at 502 (individual firemen and their union); *Delaware Valley Citizens' Council, supra,* 674 F.2d at 972 (37 state legislators); *New Orleans Public Service, Inc., supra,* 690 F.2d at 1210 (consumers).

■ Whether or not it is particularly helpful to speak of a "presumption" of adequate representation by the sovereign in *parens patriae* litigation, we agree with the Third, Fifth and District of Columbia Circuits that, in litigation of this sort, a greater showing that representation is inadequate should be required. It is not enough that the applicant would insist on more elaborate pre-trial or pre-settlement procedures or press for more drastic relief, particularly when the sovereign's interest is in securing preventive relief of the same general sort as the applicant. While it would be going too far to require an applicant to demonstrate collusion, there must be, at least in cases where the applicant has no independent right to sue, *cf.* Harvard Note, *supra,* at 1178–98 (distinguishing between litigable and non-litigable interests), a strong affirmative showing that the sovereign is not fairly representing the interests of the applicant.

In arguing that no special consideration of adequacy of representation is required by the fact that governmental plaintiffs are suing as *parens patriae,* and that "only a minimal showing that representation may be inadequate is required for intervention under Rule 24(a)(2)' ....," Brief for ETF, PPF and OCN at 28, appellants rely heavily on *Trbovich v. United Mine Workers,* 404 U.S. 528, 92 S.Ct. 630, 30 L.Ed.2d 686

(1972).[15] Trbovich, a member of a union, filed a complaint with the Secretary of Labor that led the Secretary to institute a suit under the Labor Management Reporting and Disclosure Act ("LMRDA") to set aside the union election. The Court of Appeals for the District of Columbia Circuit denied Trbovich's motion to intervene under Rule 24(a)(2), finding that the LMRDA, which vested power to challenge an election exclusively in the Secretary, impliedly barred intervention by a union member in the Secretary's suit. The Supreme Court reversed. Although the bulk of its opinion was devoted to showing from a review of the LMRDA's legislative history that the Secretary's implied bar position was unjustified, the Court also addressed briefly his alternative argument that "even if the LMRDA does not bar intervention, petitioner has no right to intervene under the terms of Fed.Rule Civ.Proc. 24(a)(2)." *Id.* at 537–38, 92 S.Ct. at 636. Rather than contending that Trbovich's interest in the litigation was insufficient, the Secretary argued that he adequately represented any interest Trbovich might have. The Court, however, thought it "clear that in this case there is sufficient doubt about the adequacy of representation to warrant intervention.[10]" *Id.* at 538, 92 S.Ct. at 636. Footnote 10 said:

> The requirement of the Rule is satisfied if the applicant shows that representation of his interest "may be" inadequate; and the burden of making that showing should be treated as minimal. See 3B J. Moore, Federal Practice ¶ 24.-09–1[4] (1969).

404 U.S. at 538 n. 10, 92 S.Ct. at 636 n. 10.[16] The Court's doubts about the adequacy of representation that the Secretary might provide Trbovich derived from its reading of the LMRDA as imposing on the Secretary a duty to serve "two distinct interests"—the individual Union member's interest in the election's outcome and the general public's interest in free and democratic union elections. *Id.* at 538–39, 92 S.Ct. at 636–37. According to the Court, "[b]oth functions are important, and they may not always dictate precisely the same approach to the conduct of the litigation;" the question concerning the adequacy of representation thus arose when and because the Secretary sought to fulfill his statutory obligations. *Id.* at 539, 92 S.Ct. at 636. The differences between *Trbovich* and the present case are significant. The Secretary did not purport, as the United States, State and City do here, to be suing as a *parens patriae,* but rather to enforce the provisions of the LMRDA and also in

---

15. The Supreme Court had previously dealt with intervention in a government enforcement action in *Cascade Natural Gas Corp. v. El Paso Natural Gas Co.,* 386 U.S. 129, 87 S.Ct. 932, 17 L.Ed.2d 814 (1967), which related both to the unamended and the amended Rule 24. However, *Cascade* has come to be regarded as an extraordinary case, occasioned by the Court's "splenetic displeasure" with the government's lack of diligence in seeking relief. *Smuck v. Hobson,* 408 F.2d 175, 179 n. 16 (D.C.Cir.1969) (en banc); Kaplan, *supra,* 81 Harv.L.Rev. at 406–07; Shapiro, *supra,* 81 Harv.L.Rev. at 730. *See also* Shreve, *supra,* 74 Nw., U.L.Rev. at 923 n. 124. The Court's per curiam dismissal a few months later on an appeal from a denial of intervention in a case involving similar facts supports the District of Columbia Circuit court's evaluation of *Cascade. See Lupton Mfg. Co. v. United States,* 388 U.S. 457, 87 S.Ct. 2112, 18 L.Ed.2d 1318, *dismissing appeal from United States v. Aluminum Co. of America,* 41 F.R.D. 342 (E.D.Mo.1967).

16. The "may be" language does not come from the amended Rule 24(a) that was before the Court in *Trbovich,* which it quoted in footnote 9, but from the Rule as it stood prior to the 1966 amendment at which time it required a showing that the "representation of the applicant's interest by existing parties is or may be inadequate." As authority for its interpretation of Rule 24(a)(2)'s adequacy of representation requirement, the Court cited the first edition of Professor Moore's treatise at ¶ 24.09–1[4]. The effect of the change from "is or may be" to "is" would seem to us to make the required showing of inadequacy more stringent. The current edition of the Moore treatise acknowledges the Court's characterization in *Trbovich,* but states immediately following this:

> Under the *parens patriae* concept, a state that is a party to a suit is presumed to represent the interest of all its citizens. A minimal showing that the representation may be inadequate is not sufficient ....

3B Moore's Federal Practice ¶ 24.07[4] at 24–71–72.

the possibly conflicting role as Trbovich's "lawyer," 404 U.S. at 539, 92 S.Ct. at 636. Here the governmental plaintiffs claim to represent the interests of their constituents, including appellants, as *parens patriae* in seeking to abate a dangerous pollution hazard. Appellants have not pointed to anything like the conflicting statutory obligations imposed on the Secretary in *Trbovich* to challenge this claim and thus to justify requiring only a "minimal" burden to show possible inadequate representation. The mere existence of disagreement over some aspects of the remediation necessary to abate the hazard does not demonstrate a lack of capacity on the part of the government as *parens patriae* to represent its constituents fairly and faithfully.

Appellants respond that, despite these considerations and the decisions of other circuits, this court has already adopted the *Trbovich* footnote's "minimal burden" analysis even in *parens patriae* suits. Appellants cite *NYPIRG v. Regents*, 516 F.2d 350 (2d Cir.1975) (per curiam), and *United States Postal Service v. Brennan*, 579 F.2d 188 (2d Cir.1978), but neither supports them. *NYPIRG* was not an enforcement action, but rather an attack by consumers *against* a regulation of the Regents of the University of the State of New York. The proposed intervenors, pharmacists and their society, sought to intervene on the side of the Regents to defend the regulation. The State was not acting as a *parens patriae*. Moreover, the court made no mention of *Trbovich* or of a "minimal burden," instead allowing intervention largely because the Regents conceded the inadequacy of their representation of the pharmacists. Here, the United States and the City vigorously assert the adequacy of their representation of the residents of Niagara Falls, New York, and the Province makes the same claim with respect to Canadian users of the Niagara River and Lake Ontario. In the *Brennan* case, the National Association of Letter Carriers sought to intervene in an action by the Postal Service to enjoin the running by defendants of a small mail delivery service.

Despite the fact that the Postal Service did not claim to sue as a *parens patriae*, indeed, the court noted that the Postal Service is "a semi-private corporation," 579 F.2d at 191, the court there held that the Postal Service adequately represented the interests of the letter carriers. Thus, nothing in the law of this circuit shakes our agreement with other circuits that in an enforcement action by a governmental entity suing as a *parens patriae*, it is proper to require a strong showing of inadequate representation before permitting intervenors to disrupt the government's exclusive control over the course of its litigation. *See also* 7A Wright & Miller, *supra*, § 1909 at 524–25, 528–29 (if "there is a party charged by law with representing [a proposed intervenor's] interest, then a compelling showing should be required to demonstrate why this representation is not adequate," and a "very compelling showing" ought to be required "when a governmental body is the named party"); 3B Moore's Federal Practice ¶ 24.07[4] at 24–72.

■ Such considerations apply with special force to actions brought by the United States to abate "an imminent and substantial endangerment" under the emergency powers provisions of the CWA, SDWA and RCRA. We need not and do not go so far as to hold that Congress impliedly repealed Rule 24(a)(2) for such suits in order to conclude, as we do, that intervention as of right in such actions is to be narrowly limited and requires a particularly strong showing of inadequate representation by the applicant for intervention. As has been shown above, Congress "carefully restricted" the rights of private persons to bring or to intervene in actions of this sort. S.Rep. No. 414, *supra*, at 78, 1972 U.S. Code Cong. & Ad.News at 3745 (CWA); S.Rep. No. 988, *supra*, at 18 (RCRA). We have already quoted the legislative materials explaining that the reason for this restriction is Congress's felt need to limit citizen participation to enforcement of administratively established standards of liability. Congress did not intend for private individuals to be able to use the federal

courts to "substitute a 'common law' or court-developed definition of water quality" outside of the elaborate administrative process provided for by these acts. S.Rep. No. 414, *supra*, at 78, 1972 U.S.Code Cong. & Ad.News at 3745. *See also id.* at 79, 1972 U.S.Code Cong. & Ad.News at 3746.

Allowing intervention freely under Rule 24(a)(2) in government actions to enforce these emergency powers provisions would have precisely this effect. Emergency powers actions may be pursued "[n]otwithstanding any other provision," 33 U.S.C. § 1364 (CWA); 42 U.S.C. § 300i (SDWA); *id.* § 6973 (RCRA); the Administrator and the courts are authorized to overlook technological and economic feasibility and to pursue these actions unlimited by other constraints, giving paramount importance to the sole objective of the public health. *See, e.g.,* H.R.Rep. No. 1185, *supra*, at 36, 1974 U.S.Code Cong. & Ad.News at 6487 (SDWA); Skaff, *supra*, 3 Harv.Envtl.L. Rev. at 301 & n. 24; *cf.* H.R.Rep. No. 294, 95th Cong., 2d Sess. 327–29 (1977), *reprinted in* 1977 U.S.Code Cong. & Ad.News 1077, 1406–08 (Clean Air Act Amendments of 1977); H.R.Rep. No. 728, 90th Cong., 1st Sess., 17–18 (1967), *reprinted in* 1967 U.S. Code Cong. & Ad.News 1938, 1954–55 (Air Quality Control Act of 1967). These are not suits to enforce established regulatory standards. On the contrary, emergency actions are "designed to deal with situations in which the regulatory schemes break down or have been circumvented." *United States v. Waste Indus., Inc., supra,* 734 F.2d at 164. Thus, the legal standard "an imminent and substantial endangerment" is quite amorphous and open-ended, *cf.* H.R. Rep. No. 1185, *supra*, at 46–47, 1974 U.S. Code Cong. & Ad.News at 6487–88 (SDWA) (defining "imminent" and "substantial" broadly); S.Rep. No. 988, *supra*, at 18 (RCRA) (Administrator may bring enforcement action "upon presentment of evidence which satisfies him that the danger is imminent and substantial"), and has been construed broadly in order to leave the Administrator free to abate emergency pollution problems, *see* Skaff, *supra*, 3 Harv.Envtl. L.Rev. at 305–18 (discussing cases); Doug-las, *supra*, 5 Envtl.Aff. at 536–37; *cf.* H.R. Rep. No. 294, *supra*, at 328, 1977 U.S.Code Cong. & Ad.News at 1407 ("like comparable authority in the Safe Drinking Water Act," construe emergency powers provision of Clean Air Act broadly). Indeed, in amending the emergency powers provision of the RCRA in 1980, the Senate Report explained that the emergency powers provision "is essentially a codification of common law public nuisance remedies," emphasizing, however, that it "should not be construed solely with respect to the common law" because some concepts "are meant to be more liberal than their common law counterparts." S.Rep. No. 172, 96th Cong., 2d Sess. 5 (1980), *reprinted in* 1980 U.S. Code Cong. & Ad.News 5019, 5023. The emergency powers provisions thus provide precisely the kind of " 'common law' or court-developed" standard to which Congress had not wished citizen participation to apply. We must be careful not to open a back door to the courthouse when Congress deliberately closed the front door.

There is another reason to apply Rule 24(a)(2) narrowly in this case. The emergency powers provisions confer "broad authority" on the Administrator to provide him with substantial flexibility needed to prevent imminent hazards. *See* H.R.Rep. No. 1185, *supra*, at 34–35, 1974 U.S.Code Cong. & Ad.News at 6487–88 (SDWA); S.Rep. No. 414, *supra*, at 78, 1972 U.S. Code Cong. & Ad.News at 3744 (CWA); Douglas, *supra*, 5 Envtl.Aff. at 536–37; *see generally* Skaff, *supra*, 3 Harv.Envtl. L.Rev. 298. This broad authority granted to the Administrator extends not only to the decision to bring a suit, but also to defining what level of a given pollutant constitutes "an imminent and substantial endangerment," and, most importantly, to deciding what the appropriate remedy should be. *See* 33 U.S.C. § 1364 (CWA) (Administrator should "take such other action as may be necessary" to abate the hazard); 42 U.S.C. § 300i (SDWA) (action Administrator may take "may include (but shall not be limited to)" issuing orders and filing civil actions); *id.* § 6973(a) (RCRA as

amended in 1980) (Administrator may "take other action under this section including, but not limited to, issuing such orders as may be necessary to protect public health and the environment"); Skaff, *supra*, 3 Harv.Envtl.L.Rev. at 318–23. The proper exercise of this authority requires that the Administrator's discretion under this provision be left relatively untrammeled. *See Committee for Consideration of Jones Falls Sewage Sys. v. Train*, 387 F.Supp. 526, 529–30 & n. 3 (D.Md.1975); Skaff, *supra*, 3 Harv.Envtl.L.Rev. at 301 n. 23, 315–23 n. 23. The government and the private intervenor may differ over both the standard of liability and the proper remedy. The diversion of time and resources as well as the risk that a court will err in evaluating the positions of the Administrator and the intervenor on technological and scientific questions at the outer limits of a court's competence, dictates the need to require a strong showing of inadequacy of representation before impairing the Administrator's control over the litigation.[17]

This analysis also provides a further basis for holding that the "minimal" requirement of the *Trbovich* footnote does not govern this case. In *Trbovich*, the reason that the Court held that intervention would be permitted under the LMRDA, despite the fact that the statute vested exclusive authority in the Secretary of Labor to bring enforcement actions, related to the purpose for which initiation of the suits was made exclusive. According to the Court, the legislative history of the LMRDA

> shows that Congress made suit by the Secretary the exclusive post-election remedy for two principal reasons: (1) to protect unions from frivolous litigation and unnecessary judicial interference with their elections, and (2) to centralize in a single proceeding such litigation as

might be warranted with respect to a single election. Title IV as enacted serves these purposes by referring all complaints to the Secretary *so that he can screen out frivolous ones, and by consolidating all meritorious complaints in a single proceeding*, the Secretary's suit in federal district court.

404 U.S. at 532, 92 S.Ct. at 633 (emphasis added). Based on this conclusion and on the further conclusion that "[t]here is no evidence whatever that Congress was opposed to participation by union members in the litigation, so long as that participation did not interfere with the screening and centralizing functions of the Secretary," *id.* at 532–33, 92 S.Ct. at 633, the Court permitted intervention in suits brought by the Secretary. Significantly, however, the Court limited the intervention to the claims presented by the Secretary's complaint, barring intervenor from raising new issues, although this limitation was not applied to the terms of a new election if the court found one to be necessary. *Id.* at 537 & n. 8, 92 S.Ct. at 636 & n. 8.

The history with respect to the emergency powers provisions here at issue is quite different. There is substantial evidence that Congress was opposed to participation by private citizens in this kind of litigation. Moreover, the nature of a suit under the LMRDA makes the *Trbovich* analysis plausible, since Congress had little reason to fear that private intervention, limited to the issues raised by the Secretary, would impede his enforcement of the LMRDA. Litigation under the LMRDA is relatively straightforward; once the action is brought, the legal standards for determining liability are laid out fairly clearly in the statute. Although LMRDA cases may involve sticky factual disputes, these mostly involve conflicting testimony among various witnesses that require only evaluations

---

17.  *Cf.* Harvard Note, *supra*, at 1177:
     To the extent that the government is vested with discretion to formulate enforcement policy, it may, more persuasively than other plaintiffs, demand exclusive control over the course of the litigation.
     The Notes goes on to conclude:

[I]t is the appropriate scope of government discretion under the enforcement scheme which primarily determines when applicants with nonlitigable interests would be viewed as inadequately represented and should be permitted to intervene.
*Id.* at 1190.

of credibility. Even if the government and the intervenor should disagree over the proper remedy, there is little likelihood that such differences will require the presentation of extensive evidence or force a court to decide complex scientific and technological questions about which its knowledge is limited. In contrast, intervention in actions under the emergency powers provisions of these water pollution acts, even limited to issues raised by the EPA, is likely to lead to long delays for additional discovery, the prolongation of cross-examination of witnesses, and the necessity to engage in extensive investigation and cross-examination of the intervenors' witnesses, all of which is likely unduly to prolong resolution of the case. Additional delay may also result— unless the intervention is conditioned against this, see Shore v. Parklane Hosiery Co., 606 F.2d 354, 356–57 (2d Cir. 1979); 1966 Advisory Committee Note— from attempts to block settlement by refusing to assent, the ordinary prerogative of one who has been admitted as a party. To be sure, it can be argued that the very difficulty of the technological questions in such cases is a reason to give the court all the help it can get. However, Congress seems to us to have reached the opposite conclusion when it limited citizens' statutory right to intervene to suits relating to standards already developed by the EPA, deliberately excluding suits by the Administrator under the emergency powers. In contrast to the action in Trbovich, there

are thus numerous reasons to find that the "exclusivity" in authority to bring these suits continues for the duration of the action in the absence of a very strong showing of need.

■ This brings us finally to the question of the standard of our review of Chief Judge Curtin's order. It seems to have been thought at one time that the standard of review under Rule 24(a)(2) was de novo review for any error,[18] see, e.g., International Mortgage & Inv. Corp. v. Von Clemm, 301 F.2d 857, 860–64 (2d Cir.1962); Levin v. Ruby Trading Corp., 333 F.2d 592, 594–95 (2d Cir.1964); 7A Wright & Miller, supra, § 1923 at 628–29, whereas orders denying petitions for permissive intervention were reviewable only for clear abuse of discretion, if, indeed, they were reviewable at all,[19] see, e.g., Allen Calculators, Inc. v. National Cash Register Co., 322 U.S. 137, 142, 64 S.Ct. 905, 908, 88 L.Ed. 1188 (1944); SEC v. Everest Mgmt. Corp., 475 F.2d 1236, 1238–39 & n. 2 (2d Cir.1972); 7A Wright & Miller, supra, § 1923. However, it is now the rule in this circuit that denials of motions to intervene as of right under Rule 24(a)(2) also are to be reviewed under an abuse of discretion standard. See Chance v. Board of Education, 496 F.2d 820, 826 (2d Cir.1974) (denied on basis of finding adequate representation); Rios v. Enterprise Ass'n Steamfitters Local Union No. 638, 520 F.2d 352, 355 (2d Cir.1975) (denial for lack of interest and impairment); Crown Financial Corp.

---

**18.** Some statements hedged this standard of review slightly: "[t]he appellate court can substitute its judgment for that of the trial court if it regards the urgency great enough to warrant a determination that intervention should be of right." James & Hazard, Civil Procedure 514 (2d ed. 1977).

**19.** The traditional doctrine respecting the appealability of denials of permissive intervention was that if the court determined that there was no abuse of discretion, it must dismiss the appeal for lack of jurisdiction on the ground that the order was not final. See C. Wright, supra, at 508; 7A Wright & Miller, supra, § 1923 at 630. This was a particularly ineffective limitation on appellate jurisdiction, since it made appealability turn on the merits, see Levin, supra, 333 F.2d at 594, and we have subsequently held that a

district court's order denying permissive intervention is final for purposes of appeal, see Ionian Shipping Co. v. British Law Ins. Co., 426 F.2d 186, 188–89 (2d Cir.1970). In practice, holding the denial of a motion for permissive intervention to be unreviewable and reviewing it under the clear abuse of discretion standard may come down to the same thing; a denial of permissive intervention has virtually never been reversed. See United States Postal Service v. Brennan, supra, 579 F.2d at 192; C. Wright, supra, at 508 (calling difference "illusory"); 7A Wright & Miller, supra, § 1923 at 631 ("wholly illusory" difference). But see Crumble v. Blumthal, 549 F.2d 462, 468–69 (7th Cir.1977) (finding abuse of discretion), according to Professor Wright, the only such case, see C. Wright, supra, at 508.

v. *Winthrop Lawrence Corp.*, 531 F.2d 76, 77 (2d Cir.1976) (per curiam) (denied for lack of interest and as untimely); *United States Postal Service v. Brennan, supra,* 579 F.2d at 191 (denied on basis of finding of adequate representation); *Van Gemert v. Boeing Co.,* 739 F.2d 730, 738 (2d Cir. 1984) (denied on basis of finding of adequate representation). *But cf. Shore v. Parklane Hosiery Co., supra,* 606 F.2d at 357–58 (applying "prejudicially erroneous" standard of review). Although this more relaxed standard of review may tend in practice to blur somewhat the distinction between intervention as of right under Rule 24(a)(2) and permissive intervention under Rule 24(b), the great variety of factual circumstances in which intervention motions must be decided, the necessity of having the "feel of the case" in deciding these motions, and other considerations essential under a flexible reading of Rule 24(a)(2), particularly in government enforcement actions, are precisely those which support an abuse of discretion standard of review. *See United States v. McCoy,* 517 F.2d 41, 44 (7th Cir.) (Stevens, J.), *cert. denied,* 423 U.S. 895, 96 S.Ct. 195, 46 L.Ed.2d 127 (1975).[20]

■ We cannot conclude that Chief Judge Curtin abused his discretion in this case, even giving the term "abuse" a "narrow" reading, *see* Friendly, *Indiscretion about Discretion,* 31 Emory L.J. 747, 764 & n. 42 (1982). When all is said and done, appellants' position is simply that their interests are more "focused" than are those of the United States, the State of New York, the Province of Ontario and the City of Niagara Falls. Appellants believe that

this intensified focus places them in a drastically different stance than these governmental plaintiffs. In point of fact, with the exception of NEA's request for a medical detection program, they have asked for little that is new or even particularly different from the relief sought by plaintiffs. The bottom line appears to consist of little else than assertions by appellants that they would insist on more and more detailed testing before even considering a settlement, and that these tests might lead the district judge to conclude that certain aspects of the elaborate settlement worked out between the parties should be altered. It simply cannot be that a court hearing an appeal from a denial of intervention is required to wade through the mass of technical and scientific data tendered by appellants in support of their claim of inadequate representation and to make what amounts to a preliminary decision on the same issues that would arise on an appeal from an order approving the settlement. That task is best left to the district judge, particularly this judge, who has lived for the last five years with this action and the three related actions brought by the Government against Hooker, and who has supervised discovery, seen the attorneys for the parties and the proposed intervenors in action, and been in intimate contact with the settlement discussions. He especially is in a far better position than we to weigh the advantages to be derived from appellants' participation as intervenors (as distinguished from the *amici*-plus status he offered), against the disadvantages that will result from delaying remediation of this pollution hazard to the parties and to

---

20. The point was made succinctly in Shreve, *supra,* 74 Nw.U.L.Rev. at 922–23 (footnotes omitted):

  Intervention controversies, however, cannot be resolved with reference to a rule of general application. The case to case permutations and varying configurations of concerns for and against intervention make these controversies rule-resistant. The circumstances that serve as a basis for decision are so varied and random that the court would virtually need to create a new rule to describe each case. Chief Judge Bazelon went still further in *Smuck v. Hobson, supra,* 408 F.2d 175, saying that:

"while the division of Rule 24(a) and (b) into 'Intervention of Right' and 'Permissible Intervention' might superficially suggest that only the latter involves an exercise of discretion by the court, the contrary is clearly the case." *Id.* at 178 (footnote omitted). This portion of his opinion was joined only by Judges Leventhal and Robinson, and the articles by Professor Kaplan and Shapiro cited to support the quoted statement do not go quite so far. However, he and the two judges who joined him may well have been correct.

all the citizens of the affected regions in and around Niagara Falls and Ontario. This lawsuit is approaching its fifth year, and while appellants and their members are apparently willing to endure still further delay of remediation in the interest of greater assurance for the future, no one can be sure how far these views are held by other citizens of these areas who are living under what the United States and the appellants consider imminent and serious risks. We should not upset the district judge's determination unless he has applied an improper legal standard or reached a decision that we are confident is incorrect. We cannot conclude that either of these is the case here.[21]

While these considerations are all that are needed for decision, an added reason for our reluctance to disturb Chief Judge Curtin's ruling derives from his offer to appellants of an elevated *amicus* status that would have enabled them to go a long way toward presenting their objections to the settlement. *Cf. Hoptowit v. Ray*, 682 F.2d 1237, 1260 (9th Cir.1982) (*amicus* given "full rights of parties to participate" by trial court); *Alexander v. Hall*, 64 F.R.D. 152, 155 (D.S.C.1974) ("solely within discretion of trial court to determine the fact,

extent, and manner of participation by the *amicus* "). The judge was prepared to allow appellants, as *amici*, to call their own witnesses and to cross-examine the witnesses of the settlement's proponents. Appellants responded that this was still insufficient, pointing to several differences between the offered status and the rights of an intervenor, even an intervenor limited to the claims asserted by the plaintiff. These differences are that *amicus* participation would not confer (1) the right to block a settlement by simply refusing to sign, (2) the right to have discovery and to make motions, (3) the right to appeal, and (4) the right to participate in the implementation and monitoring of the settlement's remediation plan.

Initially, we note that only the second of these claimed insufficiencies directly relates to appellants' ability to participate in the hearing and present their concerns, even if in slightly limited fashion. With respect to (1), appellants conceded at oral argument that the court could have conditioned intervention so that appellants could only voice their objections and would have no right to prevent the court's accepting the settlement;[22] indeed, appellants repre-

**21.** The Canadian appellants, PPF and OCN, argue that adequacy of representation by "existing parties" under Rule 24(a)(2) refers only to parties at the time a motion to intervene is made. Since the Province was not granted leave to intervene until after PPF and OCN had filed their intervention motions, PPF and OCN argue that the district court erred in taking the Province into account when it determined that their interests were adequately represented. We have already explained that Rule 24 must be given a flexible reading. Adequacy of representation should be applied so as to provide a functional test of a party's need to intervene. *See* Kaplan, *supra*, 81 Harv.L.Rev. at 400–03. We will not import into the rule "fetishes of form," *id.* at 403, not required by the Rule's language, that treat adequacy of representation from other than a practical perspective.

The Canadian appellants also argue that no special consideration should be given to the Province as a *parens patriae* representing their interests because the suit was prosecuted by the Ministry of the Environment which, appellants argue, lacks the legal capacity under Canadian law to represent the Province of Ontario or its citizens in court. The parties sharply dispute

whether, under Fed.R.Civ.P. 44.1, appellants have waited too long to raise an issue of foreign law. There is no need to consider the point. On this issue too we decline to let excessive formalism dictate results. A governmental party that enters a lawsuit solely to represent the interests of its citizens, as the Province did here, *see* Complaint of Province ¶ 3, Joint App. at 543, differs from other parties, public or private, that assert their own interests, even when these interests coincide with the interests of a prospective intervenor. The Province participated in the settlement hearings, and, so far as we are advised, neither the court below nor the other parties questioned its status. Whether by some technical point of Canadian law the lawyer who appeared in Chief Judge Curtin's courtroom should have come from the Attorney General's office rather than from the Ministry of the Environment hardly seems pertinent anymore, since the interests of Ontario citizens already have been represented by officials from the Provincial government as *parens patriae*.

**22.** *See* 1966 Advisory Committee Note: "An intervention of right under the amended rule may be subject to appropriate conditions or restric-

sented to this court that such a condition would be acceptable. With respect to (2), we will not simply assume that if, as *amici*, appellants had shown any real need for additional procedures before the settlement hearing, Chief Judge Curtin would have denied their requests; had he done so, we would have had a record on which to determine whether the denial of intervenor status was prejudicial. *Cf. SEC v. Charles Plohn & Co.*, 448 F.2d 546, 549 (2d Cir. 1971) (denial of motion to intervene affirmed because participation, including opportunity to submit proof and be heard on oral argument, was adequate). Similar considerations apply to (3) and (4). If, as *amici*, appellants had made a substantial case against the settlement, the judge might well have granted intervention for the purpose of taking an appeal, *see United Airlines, Inc. v. McDonald*, 432 U.S. 385, 392–96 & n. 16, 97 S.Ct. 2464, 2468–70 & n. 16 (1977) (citing cases); *Spirt v. Teachers Ins. & Annuity Ass'n*, 93 F.R.D. 627, 637 (S.D.N.Y.1982); he might also have allowed appellants to intervene for the purpose of monitoring the implementation of the decree, *see Hodgson v. United Mine Workers*, 473 F.2d 118, 129–30 (D.C. Cir.1972). Indeed, these two later possibilities are still open. To be sure, an appeal from an order approving the settlement will now be on a record where the only opposition was presented by the Province of Ontario. However, if, as PPF and OCN allege, the Province's opposition was ineffective, this defect in the record results from appellants' stiff-necked refusal to avail themselves of the opportunity offered them by the judge to participate and make their objections before the court. Appellants point to our statement in *NYPIRG*,

*supra,* 516 F.2d at 352 n. 3, that parties entitled to intervene as of right under Rule 24(a)(2) may insist upon that right despite a grant of leave to participate as *amicus curiae.* But this does not mean that, in passing upon the propriety of a district judge's exercise of discretion in denying intervention, we must ignore how nearly an applicant's interests could have been accommodated by its accepting the participation which the judge offered without prejudice to its right to appeal.

Affirmed.

tions responsive among other things to the requirements of efficient conduct of the proceedings." Of course, as Wright & Miller pointed out, "the fact that the Committee Note says that [courts] have the power does not create the power if it does not otherwise exist." 7A Wright & Miller, *supra,* § 1922 at 625. Nevertheless, courts have taken the Committee Note at face value, frequently imposing as a condition of intervention under Rule 24(a)(2) that approval of a settlement should not require the intervenor's consent, and commentators have approved

this. *See, e.g., Ionian Shipping Co., supra,* 426 F.2d at 191–92; *Smuck v. Hobson, supra,* 408 F.2d at 182; *Brennan v. Connecticut State UAW Community Action Program Council,* 60 F.R.D. 626, 632 (D.Conn.1973); *United States v. Ketchikan Pulp Co.,* 430 F.Supp. 83, 85 (D.Alaska 1977); *Hall County Historical Society v. Georgia Dept. of Transp.,* 447 F.Supp. 741, 746 & n. 1 (N.D.Ga.1978); Shapiro, *supra,* 81 Harv.L.Rev. at 727, 752–56; Harvard Note, *supra,* at 1199–1201 & nn. 103–105 (citing cases).